IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ALBERTO RAMON GARDEA,  §
TDCJ-CID NO.770055,  §
Plaintiff,  §
v.  §  CIVIL ACTION H-09-1467
KOKILA NAIK, *et al.*,  §
Defendants.  §

## OPINION ON DISMISSAL

Plaintiff Alberto Ramon Gardea, an inmate incarcerated in the Texas Department of Criminal Justice-Correctional Institutions Division ("TDCJ-CID") proceeding *pro se* and *in forma pauperis*, has filed a civil rights complaint and a more definite statement of his claims. (Docket Entries No.1, No.7).   Plaintiff seeks compensatory and punitive damages from defendants in their individual and official capacities on claims of deliberate indifference to his serious medical needs, retaliation for filing grievances, and discrimination under the Americans with Disabilities Act.   (*Id.*).   Defendants Kokila Naik, John Abraham, Sandra Smock, Jerry Palacio, and James Stubbs have filed a motion for summary judgment.[1]   (Docket Entry No.19). Plaintiff has not filed a response to the motion.   The Court will grant defendants' motion for summary judgment and dismiss this action for the reasons to follow.

## I. BACKGROUND

Plaintiff reports that he has suffered with "full blown" HIV/AIDS for twenty years, for which he takes numerous medications.   (Docket Entry No.1, page 9).   In 1999, he began to suffer painful tingling and a burning sensation in his feet; he also noticed a loss of balance and coordination in walking.   (*Id.*).   In 2003, Dr. Paar, an infectious disease expert at the

---

[1] The Court did not order that defendants James W. Mossbarger, Guy Smith, Anitha Cherian, Sandra Donaho, or William McWhorter be served with process.   (Docket Entry No.8).   For reasons addressed in this Opinion, the Court will dismiss plaintiff's claims against these defendants pursuant to 28 U.S.C. § 1915(e)(2)(B).

University of Texas Medical Branch ("UTMB"), diagnosed plaintiff with peripheral neuropathy ("PN"), a nerve disorder common to those with HIV/AIDS.  (*Id.*).  Paar prescribed pain medication and recommended special footwear from the UTMB Brace and Limb Clinic at the Jester 3 Unit ("J3 clinic"), which is headed by defendant Dr. Kokila Naik.  (*Id.*)

In October 2005, Nurse Practitioner Sandra Smock noted in provider notes that plaintiff had acquired a pair of medical boots that belonged to an old roommate, which had not been issued by J3.  (Docket Entry No.1-6, pages 1-2).  Smock indicated that she would ask security to issue plaintiff a pass for the boots.  (*Id.*, page 1).  Smock knew that by issuing him a pass for used boots, she was violating UTMB and TDCJ policy.  (Docket Entry No.7, page 19).

In February 2006, Dr. Paar recommended that plaintiff be issued two elastic ankle supports.  (Docket Entry No.1-3, page 10).  In March 2006, plaintiff received the ankle supports.  (*Id.*, page 11).  In April 2006, Dr. Paar noted that plaintiff continued to complain of problems with his feet and ankles and that he wanted medical braces, and not shoes, for his ankles.  (Docket Entry No.1-4, pages 1, 3).  The next day, Smock referred plaintiff for a brace and limb consultation.  (*Id.*, page 5).  She noted no improvement from the ankle sleeves and discontinued them.[2]  (*Id.*).

In 2006, Nurse Practitioner John Abraham made reference to plaintiff's medical boot pass in clinic notes.  (Docket Entry No.1-6, page 3).  In June 2007, Abraham noted on a medical report that plaintiff had requested a referral to J3 for medical insoles for neuropathy and that plaintiff had reported that he had medical boots that were in good shape from J3.[3]  (Docket Entry No.1-6, page 6).  Apparently, plaintiff was not referred to the J3 clinic because in August

---

[2] Plaintiff indicated the same in Step 2 Grievance No.2008101890.  (Docket Entry No.1-1, page 11).

[3] Plaintiff claims that the boots to which Mossbarger refers are the same ones that were issued by Smock via a special pass.  (Docket Entry No.7, page 19).

2007, plaintiff complained in Step 1 Grievance No.2007209144 that he had been denied medical treatment and medical footwear for the PN. (Docket Entry No.1-4, pages 25-26). Warden Mossbarger responded that plaintiff reported on June 20, 2007, that he had medical boots from J3 in good shape and that he would be scheduled for an examination to evaluate his need for another referral to the brace and limb clinic and for insoles for the existing shoes.[4] (*Id.*, page 26).

On September 7, 2007, Abraham referred plaintiff to the J3 clinic. (Docket Entry No.7, page 5). Plaintiff, however, complained in his October 29, 2007, Step 1 Grievance No.2008035427 that Dr. Naik denied the September 7th J3 referral because Abraham submitted "improper paperwork." (Docket Entry No.1-1, page 4; No.7, page 18). Plaintiff claimed that he met the requirements for such referral and requested that the medical department issue medical boots or purchase such boots from an outside source. (*Id.*, pages 4-5). Plaintiff was informed in a response in November 2007 that his initial referral was denied because he did not meet the criteria as determined by Dr. Naik and her team. (*Id.*, page 5). He was told that Abraham had referred him again on October 31, 2007, and that such referral had been approved; his appointment was scheduled in February 2008.[5] (*Id.*).

On October 24, 2007, plaintiff filed Step 1 Grievance No.2008033454, complaining that the Stringfellow Unit's administration and medical department were retaliating against him because he filed Step 1 Grievance No. 2007209144 on August 13, 2007. (Docket

---

[4] Plaintiff filed Step 2 Grievance No. 2007209144 on September 18, 2007. (Docket Entry No.1-4, pages 27-28). On October 9, 2007, Administrator Guy Smith responded that plaintiff had been seen on June 20, 2007, and on September 7, 2007. (*Id.*, page 28). Smith noted that plaintiff's request for outside purchase of gel insoles had been re-submitted for reconsideration. (*Id.*).

[5] In Step 2 Grievance No.2008035427, plaintiff complained that he met the requirements for referral under UTMB policy and that the only reason he had been given the appointment in February 2008, was because he had filed a grievance. (Docket Entry No.1-1, page 6). On December 14, 2007, Program Administrator Smith responded that the "criteria concerns you describe regarding the denial for referral of medical footwear due to Peripheral Neuropathy on 09/10/2007 appears to have been a temporary issue that has been resolved or corrected, and does not represent a pattern of inappropriate medical management or care administration." (*Id.*, page 7).

Entry No.1-5, pages 2-3).  He claimed that Abraham had changed his HIV/AIDS chronic care clinic appointments from four times a year to twice a year.  (*Id*., page 2).  Plaintiff based this belief on Abraham's response to a sick call request in which Abraham stated that he had a chronic care clinic appointment in March 2008.  (*Id.*).  Plaintiff noted that his appointment with Abraham on September 23, 2007, was not a chronic care clinic appointment.  (*Id*.).  Practice Manager Anitha Cherian responded on November 5, 2007, that plaintiff would still be seen twice a year in "in-clinic, face to face appointments."  (*Id*., page 3).  She also noted that plaintiff was scheduled for a chronic clinic via video clinic in late November.[6]  (*Id*.).

On February 14, 2008, plaintiff was taken to the J3 clinic.  (Docket Entry No.7, page 6).  Dr. Naik noted in clinic notes that plaintiff had been seen for evaluation and referred for insoles.  (Docket Entry No.7-1, page 12).  He was issued one pair of size 9 Lehigh insoles.  She indicated that "[t]he referral states no abnormalities of the feet, so we will not be seeing him for footwear."  (*Id.*).

Plaintiff claims that Dr. Naik had predetermined that plaintiff would be treated differently than all other patients.  (Docket Entry No.7, page 6).  He claims this order was issued before his case was reviewed based on the following events that allegedly took place while he was in the waiting area of the J3 clinic:  Dr. Naik entered the waiting room where plaintiff was seated and asked aloud, "Who is Gardea?"  When she found out who he was, she returned to her office and called physical therapists Jerry Palacio and James Stubbs to join her.  (*Id*., page 7).  When the three returned to the waiting area, Dr. Naik pointed to plaintiff and said,

---

[6] Plaintiff complained in Step 2 Grievance No.2008033454 on November 20, 2007, that his grievance had not been properly investigated and that the appointments had been changed in retaliation for filing the grievance in August 2007.  (Docket Entry No.1-5, pages 4-5).  Program Administrator Smith responded on December 4, 2009, that plaintiff had been seen in the chronic clinic on March 29, 2007, and November 8, 2007, and that he had been seen by Dr. Paar on May 30, 2007.  (*Id.*, page 5).  Smith also reported that plaintiff was scheduled for another appointment with Paar in December 2007.  (*Id.*).

"that is Gardea, who is filing grievances on us." (*Id*.).  One assistant, Physical Therapist Jerry Palacio, asked plaintiff his shoe size and after plaintiff answered, Palacio told him that he was going to bring him a size 9 insole and that was all plaintiff was going to get. (*Id*.).  Plaintiff asked why he would not be reviewed for medical boots or other footwear, and Palacio replied that Dr. Naik had only prescribed insoles and plaintiff was lucky to be getting that.  (*Id*.). Plaintiff asked to speak to Naik but was told that she felt that he had HIV and PN for years, which were incurable, and that he would just have to deal with it.  (*Id*.).  When plaintiff attempted to talk to Naik, she told him to file another grievance and ordered him to leave her office because he had AIDs and he was taking up her time.  (*Id*.).  As he left, plaintiff tried to explain his pain to the other assistant, Physical Therapist James Stubbs, but Stubbs said, "Look Gardea, if you wish to file grievances against our department, then you'll just have to suffer the consequences." (*Id*.).  Naik appeared and plaintiff complained that they had not looked at his files or touched him.  (*Id.*, pages 7-8).  Naik responded, "[T]hat's the point Gardea.  I will not touch you, get the insoles or leave." (*Id*., page 8).

On February 28, 2009, plaintiff complained in Step 1 Grievance No.2008101890 that after Naik identified him, she called two staff members into her office and when they reappeared, she identified plaintiff to the staff members.  (Docket Entry No.1-1, page 9).  One staff member told him that the nurse practitioner wrote in his chart for the referral that plaintiff had no deformity of his feet; therefore, he did not qualify for boots but did qualify for medical insoles.  (*Id*.).  When plaintiff questioned Dr. Naik, she told him that he was referred for insoles and that because he was medically unassigned, he did not get boots or shoes.  (*Id*.).  Plaintiff made no mention of Naik's alleged reference to the grievances he filed.  (*Id*., pages 9-10).  He did, however, allege Naik's denial of his request for medical boots was retaliatory because he

had filed Grievance Number 2008035427 against her and her staff.   (*Id.*, page 10).   In the

response on March 19, 2008, plaintiff was informed of the following:

> Orthotic shoes are issued based on medical necessity.  Dr. Naik made a
> medical determination per her note on 2/14/08 that the 'referral states no
> abnormalities of the feet, so we will not be seeing him for footwear."
> Policy G-59.3 states that orthotic footwear prescribed during Brace and
> Limb clinic are for work purpose encounters.  And it states that Patients
> with diabetes and/or HIV, may have diagnosis of neuropathies, but if that
> does not create obvious weakness in ankles, then unit need to provide
> footwear.  Dr. Niak [sic] followed the policy for this patient and he was
> not retaliated against.

(*Id.*, page 10).  Plaintiff complained in Step 2 Grievance No.2008101890 that he had a history of

ankle problems and that Naik did not review his medical records but relied on the referral.  (*Id.*,

page 11).  Administrator Smith responded on May 2, 2008, that there were several changes in the

eligibility requirements for special footwear; he also noted that plaintiff had been seen by the

provider on May 1, 2008, and referred to the J3 Prosthesis regarding his request for medical

boots.[7]  (*Id.*).

On February 3, 2009, plaintiff filed Step 1 Grievance No.2009092326,

complaining that Dr. Naik and her team discriminated against him by denying his request for

proper medical footwear because he was medically unassigned.  (Docket Entry No.1-4, pages 12-

13).  Plaintiff claimed that he met the criteria under UTMB's guidelines and that two offenders

who were also medically unassigned had received medical footwear from Dr. Naik.  (*Id.*).  One

inmate had screws in his ankles; the other inmate had diabetes.  (*Id.*).  Plaintiff surmised that

---

[7] On April 21, 2008, plaintiff filed Step 1 Grievance No.2008129971, in which he complained that Physician's
Assistant Wallace had notified him that his referral to J3 clinic for medical boots/shoes had been denied.  (Docket
Entry No.1-1, pages 16-17).  Plaintiff noted that Wallace had appealed the denial but the appeal had been denied.
(*Id.*, page 16).  Plaintiff once again pleaded that his medical records showed that he was eligible for the shoes.  (*Id.*,
pages 16-17).  In a response dated April 25, 2008, plaintiff was informed that he was ineligible because he did not
have a work assignment.  (*Id.*, page 17).  Plaintiff challenged the response in Step 2 Grievance No.2008129971 on
June 3, 2008.  (*Id.*, pages 26-27).  Administrator Smith noted in his response of June 3, 2008, that PA Wallace had
refused to appeal the decision to deny medical boots.  (*Id.*, page 27).  Wallace had made a second referral but it was
also denied.  (*Id.*).

Naik and her team discriminated against him because of the grievances that he had filed, his ethnicity, or his disease.  (*Id.*, page 13).  Practice Manager William McWhorter responded on February 27, 2009, as follows:

> The facility provider referred on 2/19/08 and 5/1/08 for HIV/Neuropathy and these referrals were denied based on policy G-59.3 which states "Patients with diabetes and/or HIV may have diagnosis of neuropathies, but if that does not create obvious weakness in ankles, then Unit needs to provide footwear."  You do not meet criteria for special medical footwear. Medical information of other patients can not be provided to you as their records are protected under HIPPA.   Your claim[s] that you were discriminated/harassed by Naik or her staff were unfounded.  They were following the criteria as established by health services.

(*Id.*).  In his April 10, 2009, response to Step 2 Grievance No.2009092326, Administrator Smith indicated that plaintiff's charge of discrimination had been investigated by the Office of Professional Standards, which found no discrimination.  (*Id.*, page 15).  Plaintiff was informed that he had been seen by Dr. Ward on March 10, 2009, and that he had a pending appointment with a prosthesis fitting within six months.  (*Id.*).

On March 3, 2009, plaintiff filed Step 2 Grievance No.2009109604 complaining that Facility Practice Manager Donaho violated his right to access courts by failing to respond to a four-page I-60 by which plaintiff was attempting to informally resolve some issue before he filed a grievance.  (Docket Entry No.1-5, page 10).  Plaintiff claims that her failure to respond to the informal resolution denied him the ability to exhaust his administrative remedies under the Prison Litigation Reform Act.[8]  (*Id.*).  Practice Manager McWhorter responded on March 18, 2009, that he found no indication of retaliation and was unable to substantiate plaintiff's claims regarding the informal resolution.  (*Id.*, page 11).  Program Administrator Smith responded to plaintiff's Step 2 Grievance No. 2009109604 on April 28, 2009.  (*Id.*, page 13).  He also found

---

[8] Plaintiff does not complain in the pending complaint that Donaho deprived him of his right to access the courts.

no retaliation and no evidence to support plaintiff's allegations regarding the informal resolution. (*Id.*).

## II. DISCUSSION

### A. 28 U.S.C. § 1915(e)(2)(B)

When a litigant proceeds *in forma pauperis*, as in this case, the district court may scrutinize the basis of the complaint and, if appropriate, dismiss the case without service of process if the claim is frivolous, malicious, fails to state a claim upon which relief may be granted or seeks monetary relief from a defendant who is immune from such relief.  42 U.S.C. § 1997(e)(c) and 28 U.S.C. § 1915(e)(2)(B).  An action is frivolous if it lacks any arguable basis in law or fact.  *Neitzke v. Williams*, 490 U.S. 319, 325 (1989); *Talib v. Gilley*, 138 F.3d 211, 213 (5th Cir. 1998).  "A complaint lacks an arguable basis in law if it is based on an indisputably meritless legal theory, such as if the complaint alleges violation of a legal interest which clearly does not exist."  *Harris v. Hegmann*, 198 F.3d 153, 156 (5th Cir. 1999).  A review for failure to state a claim is governed by the same standard used to review a dismissal pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  *See Newsome v. EEOC*, 301 F.3d 227, 231 (5th Cir. 2002).

Plaintiff complains that Warden James Mossbarger, Program Administrator Guy Smith, Practice Manager Anitha Cherian, Practice Manager Sandra Donaho, and Practice Manager William McWhorer retaliated against him and were deliberately indifferent to his serious medical needs because they did nothing to stop the wrongful acts committed by defendants Naik, Palacio, Stubbs, Smock, and Abraham even though they were aware of such acts.  (Docket Entries No.1, No.7).  Mossbarger, Smith, Cherian, Donaho, and McWhorer are the administrators who responded to the grievances in which plaintiff complained of deficient

8

medical care, discrimination, and retaliation.   To the extent that plaintiff complains of their responses to his grievances, he is not entitled to relief.   An inmate does not have a federally protected liberty interest in having grievances resolved to his satisfaction.   *Geiger v. Jowers*, 404 F.3d 371, 374 (5th Cir. 2005).

To the extent that he complains that these defendants violated his rights because of their administrative or supervisory positions, his claim is legally frivolous.   Section 1983 will not support a claim based on *respondeat superior* or vicarious liability.   *Pierce v. Texas Dept. of Criminal Justice-Institutional Div.*, 37 F.3d 1146, 1150 (5th Cir. 1994).   "Personal involvement is an essential element of a civil rights cause of action."   *Thompson v. Steele*, 709 F.2d 381 (5th Cir. 1983).   Each defendant must either actively participate in the acts complained of or implement unconstitutional policies that result in injury.   *Mouille v. City of Live Oak, Texas*, 977 F.2d 924, 929 (5th Cir. 1992).   Plaintiff states no facts to show that Mossbarger, Smith, Cherian, Donaho, and McWhorer were personally involved in any act or omission that forms the basis of the present suit or that they initiated or implemented an unconstitutional policy with respect to the same.   Plaintiff's claims against these defendants are conclusory and legally frivolous; therefore, they are subject to dismissal.

### B. Summary Judgment

Defendants Naik, Abraham, Smock, Palacio, and Stubbs move for summary judgment on grounds that plaintiff's claims against defendant Smock are time-barred and they are entitled to Eleventh Amendment immunity in their official capacities and qualified immunity in their individual capacities.   (Docket Entry No.19).

To be entitled to summary judgment, the pleadings and summary judgment evidence must show that there is no genuine issue as to any material fact and the moving party is

entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  The moving party bears the burden of initially pointing out to the court the basis of the motion and identifying the portions of the record demonstrating the absence of a genuine issue for trial.  *Duckett v. City of Cedar Park, Tex.*, 950 F.2d 272, 276 (5th Cir. 1992).  Thereafter, "the burden shifts to the nonmoving party to show with 'significant probative evidence' that there exists a genuine issue of material fact." *Hamilton v. Seque Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (quoting *Conkling v. Turner*, 18 F.3d 1285, 1295 (5th Cir. 1994)).  The Court may grant summary judgment on any ground supported by the record, even if the ground is not raised by the movant.  *U.S. v. Houston Pipeline Co.*, 37 F.3d 224, 227 (5th Cir. 1994).

## 1. 42 U.S.C. § 1983

### a. Time-Barred

In cases brought under § 1983, federal courts apply the forum state's general personal injury limitations, *Wallace v. Kato*, 549 U.S. 384, 386 (2007), and its coordinate tolling provisions.  *Hardin v. Straub*, 490 U.S. 536 (1989).  In Texas, the limitations period for personal injury claims is two years.  TEX. CIV. PRAC. & REM. CODE ANN. § 16.003; *Spotts v. U.S.*, 613 F.3d 559, 573 (5th Cir. 2010).

Under federal law, a claim accrues and the limitations period begins to run "when the plaintiff has a complete and present cause of action."  *Wallace*, 549 U.S. at 388; *Spotts*, 613 F.3d at 574 (noting limitations begins to run the moment the plaintiff becomes aware that he has suffered any injury or has sufficient information to know that he has been injured).  Plaintiff's claim of deliberate indifference to his serious medical needs under the Eighth Amendment against defendant NP Sandra Smock in this case accrued 2005 and 2006, during which time she obtained a pass for medical boots and discontinued use of ankle sleeves.  Plaintiff executed the

present complaint in May 2009, more than two years after his claims against defendant Smock accrued.  Therefore, plaintiff's federal civil rights claims against defendant Sandra Smock are time-barred and subject to dismissal.

<u>b. Eleventh Amendment Immunity</u>

Suits for damages against the state are barred by the Eleventh Amendment. *Kentucky v. Graham,* 473 U.S. 159, 169 (1985).   Under the Eleventh Amendment, an unconsenting state is immune from suits brought in federal courts by her own citizens as well as by citizens of another state.   *Edelman v. Jordan,* 415 U.S. 651, 663 (1974).   Absent waiver, neither a state nor agencies acting under its control are subject to suit in federal court.   *Puerto Rico Aqueduct and Sewer Auth. v. Metcalf & Eddy, Inc.,* 506 U.S. 139, 144 (1993).   This bar remains in effect when state officials are sued for damages in their official capacity.   *Cory v. White,* 457 U.S. 85, 89 (1982).

All defendants in this case are either employees of the State of Texas or state agencies; therefore, plaintiff's claims against all defendants in their official capacities are barred by the Eleventh Amendment.  *See Will v. Michigan Dept of State Police*, 491 U.S. 58, 71 (1989) (suit not against official but state office); *Oliver v. Scott*, 276 F.3d 736, 742, 742 n. 5 (5th Cir. 2002).   Accordingly, to the extent that plaintiff seeks monetary damages on claims against defendants in their official capacities; plaintiff's claims are barred by the Eleventh Amendment.

<u>c. Qualified Immunity</u>

Qualified immunity shields government officials performing discretionary functions "from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987).   "Qualified immunity 'provides ample protection to all but the plainly

11

incompetent or those who knowingly violate the law.'" *Estate of Davis v. City of N. Richland Hills*, 406 F.3d 375, 380 (5th Cir. 2005) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Courts apply a two-step analysis to determine whether a defendant is entitled to summary judgment on the basis of qualified immunity. First, the court determines, "whether, viewing the summary judgment evidence in the light most favorable to the plaintiff, the defendant violated the plaintiff's constitutional rights," and, "[i]f so, [the court] next considers whether the defendant's actions were objectively unreasonable in light of clearly established law at the time of the conduct in question." *Freeman v. Gore*, 483 F.3d 404, 410-11 (5th Cir. 2007) (citations omitted). The court applies an objective standard based on the viewpoint of a reasonable official in light of the information then available . . . and the law that was clearly established at the time. *Id.* at 411.

When a defendant invokes qualified immunity, the burden is on the plaintiff to demonstrate the inapplicability of the defense. *McClendon v. City of Columbia*, 305 F.3d 314, 322 (5th Cir. 2002).

### i. Medical Care

Plaintiff contends that Nurse Practitioner John Abraham, Dr. Kokila Naik, and Physical Therapists Jerry Palacio and James Stubbs were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. (Docket Entry No.1). Plaintiff claims that defendants were well aware that he has long suffered from PN because his disease is well-documented in his medical records. (Docket Entry No.1, page 10). Yet, they have not provided him with the proper medical footwear in violation of UTMB policy.

Prison officials violate the constitutional prohibition against cruel and unusual punishment when they demonstrate deliberate indifference to a prisoner's serious medical needs,

constituting unnecessary and wanton infliction of pain.  *See Wilson v. Seiter*, 501 U.S. 294, 297 (1991).  To prevail on a claim of deliberate indifference to medical needs, the plaintiff must establish that the defendant denied him treatment, purposefully gave him improper treatment, or ignored his medical complaints.  *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001).  The deliberate indifference standard is a subjective inquiry; the plaintiff must establish that the prison officials were actually aware of the risk, yet consciously disregarded it. *Lawson v. Dallas County*, 286 F.3d 257, 262 (5th Cir. 2002). "[F]acts underlying a claim of 'deliberate indifference' must clearly evince the medical need in question and the alleged official dereliction."  *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985).  "The legal conclusion of 'deliberate indifference,' therefore, must rest on facts clearly evincing 'wanton' actions on the part of the defendants."  *Id*.  Mere negligence does not constitute a section 1983 cause of action. *See Wagner v. Bay City*, 227 F.3d 316, 324 (5th Cir. 2000) ("the subjective intent to cause harm cannot be inferred from a ... failure to act reasonably").  Delay in obtaining medical treatment does not constitute deliberate indifference unless it is shown that the delay resulted in substantial harm.  *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993).

Defendants maintain that plaintiff has failed to allege and demonstrate that defendants Palacio and Stubbs were personally involved in the alleged failure to properly or promptly treat him.[9]  (Docket Entry No.19, page 7).  "In order to state a cause of action under section 1983, the plaintiff must identify defendants who were either personally involved in the

---

[9] Plaintiff claims that Palacio and Stubbs were Naik's assistants who followed her into an office after she identified him at the J3 clinic.  Plaintiff claims Palacio brought him insoles per Naik's order and told him that he was lucky to get them and that Naik thought that giving him medical footwear would be a waste because he had AIDS and PN for a long time.  (Docket Entries No.1, page 11; No.7, page 23).  Plaintiff claims that Stubbs informed him that if he wanted to complain and file grievances, he could live with the consequences.  (Docket Entries No.1, page 11; No.7, page 23).

constitutional violation or whose acts are causally connected to the constitutional violation alleged." *Woods v. Edwards*, 51 F.3d 577, 583 (5th Cir. 1995).

The summary judgment record does not reflect that plaintiff was examined, treated, or denied treatment by either Palacio or Stubbs or that either man had the authority to issue medical footwear to plaintiff. (Docket Entry No.19-2, page 3). Plaintiff did not mention defendant Stubbs in his grievances and indicated in one grievance that Palacio told him that Dr. Naik made the decision that he would not receive the boots. (Docket Entry No.1-1, pages 9-12). Without evidence showing personal involvement in his actual medical care, plaintiff fails to state a cognizable Eighth Amendment claim against Stubbs and Palacio.

Defendants also maintain that Nurse Practitioner John Abraham was not deliberately indifferent to plaintiff's serious medical needs. (Docket Entry No.19). The uncontroverted summary judgment record shows that Abraham was well aware the plaintiff suffered from PN and was responsive to plaintiff's complaints of pain, his desire to limit medication because of side effects, his requests for insoles or boots, and his requests for a referral to the J3 clinic. (Docket Entry No.20, pages 33; 35; 36, 41, 44, 45). He examined plaintiff numerous times and twice referred plaintiff to the J3 clinic.[10] The summary judgment record, however, does not reflect that Abraham filed incorrect paperwork on September 7, 2007, by which Dr. Naik refused plaintiff's first referral to the J3 clinic. Even if he did, such negligence is not actionable under § 1983. Moreover, the record does not reflect that Abraham had the authority to issue medical footwear or that he was the final decision-maker as to whether petitioner qualified for particular medical footwear. Plaintiff's claim that defendant Abraham

---

[10] In his second referral to the J3 clinic on October 31, 2007, Abraham indicated that plaintiff had HIV and PN, that he complained of numbness and pain on ambulation, and that he could not tolerate his medication because of the side effects. He further indicated that the HIV clinic recommended special insoles and that plaintiff had no foot deformities and no lesions. Abraham referred him to be evaluated for "medical boots/insoles." (Docket Entries No.7-1, page 35, No.20, page 45). On February 8, 2008, plaintiff was seen at the J3 clinic and issued insoles.

was deliberately indifferent to his serious medical needs is without a factual basis in this record. Accordingly, Abraham is entitled to qualified immunity.

Defendants further maintain that Dr. Kokila was not deliberately indifferent to plaintiff's PN by her first denial of Abraham's referral to the J3 clinic and by her prescription of insoles instead of medical boots in February 2008. (Docket Entry No.20).

Plaintiff, however, complains that Dr. Naik denied his first referral to the J3 clinic without reviewing his medical history and for no other reason than that she can. (Docket Entry No.7, page 5). Such complaints, however, are speculative and conclusory. The record supports Naik's determination that plaintiff did not qualify for the medical boots that Abraham requested in his first referral under Correctional Managed Care Policy G-59.3.

The stated purpose of Correctional Managed Care Policy G-59.3 is "[t]o assure that offenders with unsafe performance of major functional activities, as determined by a treating provider, have the opportunity to obtain medical prostheses and orthotic devices. " (Docket Entry No.19-3, page 2). Major functional activities include, "but are not limited to, transfer activity, ambulation, self-care activities, and balance activities." (*Id.*). The policy provides that offenders who have been identified by treating providers with medical conditions that impair their performance of major functional activities may be referred to the Brace and Limb Clinic for evaluation and appropriate treatment. (*Id.*). Offenders that are independent in major functional activities are not eligible for a referral unless the prostheses or orthotic items are required for entry into a vocational training program or assignment for a work program. (*Id.*).

Plaintiff's medical records for the year preceding the first referral showed that he was medically unassigned, did not suffer any deformity, swelling, or lesions to his lower extremities, and that he had a normal gait and a normal response to touch. (Docket Entry No.20,

pages 28, 30-31, 33, 35, 36, 37, 41).  The concern expressed by both Abraham and Dr. Paar was the pain plaintiff suffered from the PN, his intolerance for the medication prescribed, and the unavailability of the medication he requested.  (*Id.*, pages 33, 41).  Plaintiff discussed with these medical providers whether inserts, insoles, or medical boots might help to alleviate such pain; plaintiff indicated that he had good used boots and that gel insoles might provide the relief.  (*Id.*, page 36).  Nevertheless, in September 2007, Abraham requested medical boots.  (*Id.*, page 41).  Dr. Naik determined that plaintiff was not qualified under Correctional Managed Care Policy G-59.3 and denied the referral.  Plaintiff was informed of the same by Abraham and by Practice Manager Anitha Cherian in response to the grievance that he filed.  (Docket Entry No.1-1, page 4).

Plaintiff also complains that Dr. Naik was deliberately indifferent when she authorized insoles instead of medical boots on February 14, 2008.  (Docket Entry No.7, pages 6-8).  In the October 31, 2007 referral, Abraham noted that plaintiff complained of numbness and pain on ambulation and that he was unable to tolerate medication.  (Docket Entry No.20, page 45).  Abraham also noted that plaintiff "has no deformity of feet, no leasons [sic] present."  He requested an evaluation for medical boots/insoles.  (*Id.*).  Plaintiff was still medically unassigned.  Dr. Naik prescribed insoles in accordance with Attachment A to Policy G-59.3 Attachment A, which provides the following in pertinent part:

> Orthotic footwear prescribed during Brace and Limb Clinic (B&L) are for work purpose encounters.  The following are some of the medical conditions which are mild enough to be handled by facility primary providers, therefore these are not suitable for B&L referrals:
>
> *   *   *   *   *
>
> 4. Patients with diabetes and/or HIV, may have a diagnosis of neuropathies, but if that does not create an obvious weakness in ankles, then the unit needs to provide footwear.

16

(Docket Entry No.19-3, page 4).  Dr. Naik's notes from the J3 clinic dated February 14, 2008, show that plaintiff had PN and had been referred for insoles.  (Docket Entry No.7-1, page 12).  "The referral states no abnormalities of the feet, so we will not be seeing him for footwear.  NO RECALL."  (*Id.*).

Dr. Steven Bowers, the Legal Coordinator and Director of the Continuing Medical Education Committee for the University of Texas Medical Branch Correctional Managed Care attests, by affidavit, to his review of plaintiff's medical records.  Bowers notes that plaintiff returned to the J3 clinic in June 2009, and received medical boots in August 2009.[11] (Docket Entry No. 19-2, page 7).  He opines that the care plaintiff received by medical providers was timely, appropriate, and competent.  (*Id.*, page 8).  He attests that defendants "acted reasonably within the scope of standard medical practice."  (*Id.*).

The record supports Dr. Bower's attestation and expert opinion.  The medical providers, including Dr. Naik, attended to plaintiff's medical needs and prescribed treatment they thought appropriate in accordance with UTMB policy, although not the treatment that plaintiff thought necessary.  Plaintiff's dissatisfaction with the medical treatment he received does not mean that he suffered deliberate indifference.  *See e.g., Norton v. Dimazana*, 122 F.3d 286, 291-92 (5th Cir. 1997); *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991) (holding inmate's "disagreement with his medical treatment" not sufficient to show Eighth Amendment violation);

---

[11] Bowers attests to the following:  Plaintiff was referred to the Brace and Limb Clinic by PA Wallace on May 1, 2008, who noted that plaintiff's feet were unchanged; Dr. Naik denied the referral on May 5, 2008.  (Docket Entry No.19-2, page 6).  Plaintiff was later issued a crutch pass and cane.  (*Id.*, pages 6-7).  On March 10, 2009, Dr. Ward referred plaintiff to the Brace and Limb Clinic for medical boots but warned him that the referral might be denied because he wanted them for ankle support.  (*Id.*, page 7).  On June 15, 2009, plaintiff was seen in the Clinic and "noted to have pain with weight bearing, instability and gait abnormalities and was referred to an orthotist for orthotic management and training."  (*Id.*).  On August 25, 2009, plaintiff was fitted with medical boots; the next day he requests more arch support.  (*Id.*).  The request was denied.  In November, 2009, plaintiff requested a lay-in for reevaluation for different medical boots because his boots were causing more pain.  (*Id.*).  The referral could not be completed because UTMB no longer had a contract with the orthotic company.  (*Id.*).

*Fielder v. Bosshard*, 590 F.2d 105, 107 (5th Cir. 1979) (finding "[m]ere negligence, neglect or medical malpractice is insufficient" to show Eighth Amendment violation).   Plaintiff presents nothing to contravene this record or Dr. Bower's attestation.   Defendants, therefore, are entitled to summary judgment.

<u>ii. Retaliation</u>

Defendants also move for summary judgment on plaintiff's claim that defendants Abraham, Naik, Palacio, and Stubbs retaliated against him for filing grievances against them. (Docket Entry No.1).   A prison official may not retaliate against or harass an inmate for complaining through proper channels about an official's misconduct. *Woods v. Smith,* 60 F.3d 1161, 1164 (5th Cir. 1995).   To state a valid claim for retaliation under section 1983, an inmate must allege more than his personal belief that he was the victim of retaliation.   *Johnson v. Rodriguez*, 110 F.3d 299, 310 (5th Cir. 1997).   Mere conclusory allegations of retaliation are not enough.   *Moody v. Baker*, 857 F.2d 256, 258 (5th Cir. 1988).   He must allege (1) a specific constitutional right, (2) the defendant's intent to retaliate against the prisoner for his or her exercise of that right, (3) a retaliatory adverse act, and (4) causation.   *Jones v. Greninger*, 188 F.3d 322, 324-25 (5th Cir. 1999).   The inmate must allege facts showing that a defendant possessed a retaliatory motive.   *See Whittington v. Lynaugh*, 842 F.2d 818, 820 (5th Cir. 1988); *Hilliard v. Board of Pardons and Paroles*, 759 F.2d 1190, 1193 (5th Cir. 1985).   He "must produce direct evidence of motivation or, the more probable scenario, 'allege a chronology of events from which retaliation may plausibly be inferred.'"   *Woods*, 60 F.3d at 1166 (citation omitted).   Moreover, he must show that "but for" a retaliatory motive, the defendants would not have engaged in the action.   *McDonald v. Steward*, 132 F.3d 225, 231 (5th Cir. 1998).

Plaintiff claims that Naik and her team denied him medical boots in February 2008, in retaliation for a grievance that he filed against them. Plaintiff claims in the present action that Naik pointed him out to her staff members as the inmate who is filing grievances on us and Stubbs told him that if he filed grievances against the medical department, then he would have to suffer the consequences. Plaintiff did not recount the same statements in the grievance that he filed complaining of the denial of medical boots at the J3 clinic on February 14, 2008. Plaintiff did not mention Stubbs in such grievance. Instead, plaintiff stated that Palacio told him that he was getting insoles even though plaintiff said that he had been referred for both insoles and boots. (Docket Entry No.1-1, page 9). Palacio told him the decision was made by Dr. Naik. (*Id.*). Dr. Naik told plaintiff when he questioned her about the referral that he was only referred for insoles and that inmates who are medically unassigned do not get boots, only those inmates who work get boots. (*Id.*). Plaintiff complained that he was not properly evaluated and expressed his belief in such grievance that the denial of boots was retaliatory because he had filed Grievance No. 2008035427 against Naik and her staff. (*Id.*, page 10). Other than the unexhausted remark that plaintiff attributes to Stubbs in the present complaint, the record is void of evidence of causation, *i.e.,* but for plaintiff filing a grievance against her, Naik authorized insoles instead of medical boots at his February 2008, J3 clinic appointment. The record shows that Naik acted in accordance with UTMB policy.

The record also reflects no evidence that Palacio and Stubbs engaged in a retaliatory act toward plaintiff. The record does not show that either physical therapist provided plaintiff with medical care, denied him medical care, or were authorized to provide or deny him care. Accordingly, plaintiff's retaliation claims against Naik, Palacio, and Stubbs are without legal merit and therefore, subject to dismissal.

Next, plaintiff claims that because he filed Grievance No. 2007209144 on August 13, 2007, and Grievance No. 2008035427 on October 29, 2007, NP Abraham retaliated against him by changing his HIV/AIDS chronic care clinic appointments from four times a year to twice a year.  (Docket Entry No.7, page 18).

Defendants contend that no adverse retaliatory act was taken and that plaintiff was seen by chronic care providers in accordance with Chronic Care Program's CMC policy G-51, which provides the following, in pertinent part:

> E.      Frequency of ITP [Individual Treatment Plan] appointments for evaluation and treatment adjustment
>
> *      *      *      *      *
>
> 2.      ITP intervals are based upon patient acuity and clinical judgment of the practitioner, but may not exceed 6 months for HIV/AIDS, mental illness, and diabetics and 12 months for all other chronic illnesses.

(Docket Entry No.19-4, page 2).  The record shows that plaintiff was seen at least twice a year in the chronic care clinic[12] and multiple times in between chronic care clinic appointments by HIV providers in accordance with his individual treatment plan ("ITP").[13]

---

[12] Plaintiff was seen in the chronic care clinic by Abraham on March 29, 2007, six months before plaintiff filed the first grievance.  (Docket Entry No.20, pages 30-32).  Abraham scheduled a follow-up clinic visit in six months. (*Id*.).  On November 8, 2007, days after he filed the second set of grievances, plaintiff was again seen by Abraham in the chronic care clinic, who again scheduled a follow-up appointment in six months.  (*Id*., pages 48-50**).**  On May 5, 2008, plaintiff was seen by NP Nwodo in the chronic care clinic, who ordered a follow-up in one year.  (Docket Entry No.20-1, pages 8-10).  Defendants reference a chronic care clinic appointment on January 15, 2009, with PA Erica Young, but the clinic notes are not in the record.  (Docket Entry No.20, page 15).  Plaintiff's records reflect clinic nursing notes on January 15, 2009, which refer to Young's order giving plaintiff a cane pass for thirty days. (Docket Entry No.1-6, page 12).  Plaintiff was seen on July 28, 2009, in the chronic care clinic by Nurse Paulette Johnson and given a six-month follow-up appointment.  (Docket Entry No.20-1, pages 57-60).

[13] Dr. Paar examined plaintiff on May 30, 2007, at an HIV follow-up appointment pursuant to plaintiff's ITP. (Docket Entry No.20-1, pages 33-35).  On December 18, 2007, plaintiff was seen by a physician's assistant for his HIV pursuant to his ITP.  (*Id*., pages 52-53).  He was seen by medical providers on June 20, 2008, July 3, 2008, August 26, 2008, and October 22, 2008, for his HIV pursuant to his ITP.  (*Id*., pages 13-16, 17-19, 20-22, 25-27). He was also seen by medical providers for his HIV pursuant to the ITP on February 12, 2009, March 10, 2009, March 31, 2009, June 2, 2007, July 20, 2009 and July 23, 2009, October 19, 2009, and November 30, 2009.  (*Id*., pages 30-33, 34-36, 38-40, 44-46, 50-52, 53-55, 66-68, 70-72).

The record reflects no retaliatory intent attributable to Abraham and no evidence of causation, other than plaintiff's personal belief that his appointment schedule had been changed because of the grievances.  Accordingly, plaintiff's retaliation claim against Abraham is without legal merit and therefore, subject to dismissal.

### iii. Discrimination

To the extent that plaintiff complains that defendants violated his equal protection rights under the Fourteenth Amendment (Docket Entry No.1), he fails to show that defendants had any sort of discriminatory animus toward him or that they treated him differently than any other similarly situated inmate at any time.  *McCleskey v. Kemp*, 481 U.S. 279, 292, 298 (1987) (indicating that plaintiff must prove purposeful discrimination resulting in a discriminatory effect among persons similarly situated); *Woods v. Edwards*, 51 F.3d 577, 580 (5th Cir. 1995) (stating that a plaintiff must prove specific acts supporting a claim of discrimination, as opposed to his personal belief that discrimination played a part in the situation).  As previously discussed, Dr. Naik denied plaintiff boots in accordance with UTMB policy, in part because he was medically unassigned.  Although Naik may have prescribed medical boots for other medically unassigned inmates with chronic diseases, plaintiff has not shown that they were similarly situated to him with respect to life function and physical needs as defined by the UTMB policy.

Accordingly, plaintiff fails to overcome defendant's qualified immunity defense; defendants, therefore, are entitled to summary judgment.

### 2. Americans with Disabilities Act

Plaintiff claims that medical providers Naik, Smock, Stubbs, Palacio, and Abraham discriminated against him in violation of the Americans with Disabilities Act.  (Docket Entry No.1).  He claims that by denying him medical boots at the February 2008 clinic, Dr. Naik

and her staff treated him differently than other offenders with the same medical issues.  (*Id.*).  In support of such claims, plaintiff has attached the unsworn declaration of an inmate who states that he has been medically unassigned since 2005 and that he received medical boots from the J3 clinic due to diabetes in November 2008.  (Docket Entry No.1-4, page 16).

The ADA is a federal anti-discrimination statute intended to eliminate discrimination against individuals with disabilities.  *Delano-Pyle v. Victoria County, Texas*, 302 F.3d 567, 574 (5th Cir. 2002).  Title II of the ADA authorizes suits by private citizens for money damages against public entities that violate 42 U.S.C. § 12132.  See 42 U.S.C. § 12133 (incorporating by reference 29 U.S.C. § 794a).  Title II of the ADA applies to state prison facilities and state prison services.  *See Pennsylvania Dep't of Corrections v. Yeskey*, 524 U.S. 206, 210 (1998).

Although Title II provides disabled persons redress for discrimination by a public entity, it does not, by statutory definition, include individuals.  42 U.S.C. § 12131(1). Employing a limited construction of the statutory definition of public entity, courts that have addressed the question have concluded that individual defendants cannot be held liable for violation of Title II of the ADA.  *See Alsbrook v. City of Maumelle*, 184 F.3d 999, 1005 & n. 8 (8th Cir. 1999) (en banc); *Arlt v. Missouri Dep't of Corrections*, 229 F.Supp.2d 938, 942 (E.D. Mo. 2002); *Lewis v. New Mexico Dep't of Health*, 94 F.Supp.2d 1217, 1230 (D.N.M. 2000); *Calloway v. Glassboro Dep't of Police*, 89 F.Supp.2d 543, 557 (D.N.J. 2000); *see also Joseph v. Port of New Orleans*, Civil Action No. 99-1622, 2002 WL 342424, at *10 (E.D. La. March 4, 2002) (finding that "[t]he majority of courts that have addressed the issue have held that the ADA does not permit claims against persons in their individual capacities"), *aff'd,* No. 02-30297, 2002 WL 31933280 (5th Cir. Dec. 27, 2002).  Although the Fifth Circuit has not expressly

22

addressed the question of individual liability under Title II of the ADA, it has recognized that a plaintiff cannot sue an individual under the Rehabilitation Act, 29 U.S.C. § 794(a), which provides a comprehensive remedial framework and enforcement provisions similar to the ADA. *See Lollar v. Baker*, 196 F.3d 603, 609 (5th Cir. 1999).   Moreover, punitive damages are unavailable under the ADA. *Barnes v. Gorman*, 536 U.S. 181, 189-90 (2002).  To the extent that plaintiff only seeks relief from defendants in their individual capacities, he fails to state a valid cause of action against them under the ADA as a matter of law.

The ADA provides that "[a] State shall not be immune under the eleventh amendment . . . from an action in Federal or State court of competent jurisdiction for a violation of this chapter."  42 U.S.C. § 12202.  The Supreme Court has accepted this provision as an unequivocal expression of Congress's intent to abrogate state sovereign immunity.  *United States v. Georgia*, 546 U.S. 151, 154 (2006).  However, when faced with the specific issue of whether a disabled inmate in a state prison may sue the State for money damages under Title II of the ADA, the Supreme Court has held that, "insofar as Title II creates a private cause of action for damages against States for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity."   *Id.* at 159 (emphasis in original) (noting in *Tennessee v. Lane*, 541 U.S. 509, 533-34 (2004), that members of the Court disagreed regarding the scope of Congress's prophylactic enforcement powers under § 5 of the Fourteenth Amendment and but not with respect to congressional power to enforce provisions of Fourteenth Amendment by creating remedies against States for actual violations of those provisions). Because Title II prohibits a wider range of activities than the Constitution, courts are to consider the following "on a claim by claim basis" in determining whether sovereign immunity is abrogated:

1.      Which aspects of the State's alleged conduct violated Title II;

2.      To what extent such conduct also violated the Fourteenth Amendment [or Constitution]; and

3.      Insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment [or Constitution], whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid.

*Id*. To the extent that sovereign immunity is abrogated, the ADA provides for compensatory damages only upon a showing of intentional discrimination on the basis of disability. *See Delano-Pyle*, 302 F.3d at 575.

Plaintiff states no facts, and presents no evidence, to show intentional discrimination by defendants Smock, Stubbs, Palacio, or Abraham. None of these medical providers denied him access to the J3 clinic nor denied him medical boots. Plaintiff's allegations of Dr. Naik's reference to his medical conditions and the unsworn affidavit that he has attached to his pleadings do not show that Dr. Naik intentionally discriminated against him. Even if the Court found that such allegations gave rise to a fact question regarding intentional discrimination, plaintiff would not be entitled to relief under the ADA because the Court has determined that Dr. Naik did not violate the Eighth Amendment as applied to the States through the Fourteenth Amendment. Therefore, the State of Texas has not waived sovereign immunity as to such conduct. Accordingly, plaintiff cannot recover monetary damages from Dr. Naik, in her official capacity.

## III. CONCLUSION

Based on the foregoing, the Court ORDERS the following:

1.  Defendants' motion for summary judgment (Docket Entry No.19) is GRANTED.

2.  All claims against all defendants are DENIED and this complaint is
    DISMISSED WITH PREJUDICE.  All relief requested is DENIED.

3.  All pending motions are DENIED.

The Clerk of Court will send a copy of this Order to the parties.


SIGNED at Houston, Texas, this 23rd day of March, 2011.


MELINDA HARMON
UNITED STATES DISTRICT JUDGE